# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: ) | |
| ) | |
| BOBBY JOE HARGROVE, ) | CASE NO. 108-05495 |
| AND JULIE SWINNEY HARGROVE, ) | |
| ) | CHAPTER 13 |
| Debtors. ) | |
| ) | JUDGE MARIAN F. HARRISON |
| ) | |

_____

## MEMORANDUM OPINION
_____

This matter is before the Court upon an objection to confirmation filed by General Motors Acceptance Corporation (hereinafter "GMAC"). For the following reasons, which represent the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052, the Court finds that GMAC's objection should be sustained in part and denied in part.

## I. BACKGROUND

The debtors filed this Chapter 13 case and their proposed Chapter 13 plan on June 30, 2008. The meeting of creditors was held August 13, 2008, and objections to confirmation

were filed by GMAC, Nuvell Credit, and the Chapter 13 Trustee. It is GMAC's objection that remains unresolved.

GMAC filed a claim in the amount of $27,987.57, secured by a lien on the title to a 2007 Chevrolet truck that was new at the time of the contract. The contract for the purchase of the vehicle was signed on June 1, 2007 (within 910 days of the bankruptcy filing), with Heritage Automotive Center, Inc., in Lawrenceburg, Tennessee. The contract was later assigned for financing to GMAC. The primary purpose of the contract was to allow the debtors to purchase the 2007 Chevrolet truck for personal use. The loan from GMAC was not previously financed on another note nor with another lender prior to the June 1, 2007, instrument being executed.

The standard automobile financing contract used is titled "Retail Installment Sale Contract" and subtitled "GMAC Flexible Finance Plan." The agreement itemizes the amount to be financed. In reaching the "total down payment" of $881.85, the agreement sets out the following calculations:

| | | | |
|---|---|---|---|
| Gross trade-in | $17.500.00 | less payoff by seller | $19,618.15 |
| = net trade-in | ($ 2,118.15) | | |
| + REBATES | $ 3,000.00 | equals total down payment | $ 881.85 |

Pursuant to the agreement, when the total down payment was subtracted from the cash price, the unpaid balance of the purchase price was $29,653.73. Other line items, including a gap insurance premium ($495), license fees ($21), and a document fee ($75), were then added to reach the amount being financed under the agreement, $30,244.73. In the Federal Truth-in-Lending Disclosures, the down payment is listed as $881.85, and the total cost of the purchase on credit, including the down payment, is listed as $39,079.29.

In their proposed Chapter 13 plan, the debtors seek to treat GMAC's claim as secured under the provisions of 11 U.S.C. § 506 to the extent of the proposed value of the vehicle which the debtors contend is $18,875. The difference between the claim amount of $27,987.57 and the proposed value is to be treated as unsecured pursuant to 11 U.S.C. §§ 506 and 1325(a)(5).

GMAC objects, asserting that its entire claim in the new vehicle is a purchase money security interest, and therefore, the debtors cannot cramdown its claim. The debtors argue that GMAC lost its purchase money security interest status based on the financing of negative equity (where the trade-in value is less than the payoff amount) and gap insurance.

## II. DISCUSSION

The treatment of allowed secured claims in Chapter 13 plans is governed by 11 U.S.C. § 1325(a)(5), and a secured claim is defined by 11 U.S.C. § 506(a)(1), which provides in part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim.

Prior to the enactment of the Bankruptcy Abuse Protection and Consumer Protection Act (hereinafter "BAPCPA"), 11 U.S.C. § 1325(a)(5) was read with 11 U.S.C. §§ 506(a) and 1322(b)(2) to enable Chapter 13 debtors to strip-down the secured portion of a claim to the value of the collateral and to treat the excess amount owed as an unsecured claim that shared pro rata with other unsecured creditors. *See In re Bray*, 365 B.R. 850, 854 (Bankr. W.D. Tenn. 2007). *See, e.g., Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir. 1982).

BAPCPA changed this treatment for certain allowed secured claims in Chapter 13 cases by the inclusion of the "hanging paragraph" at the end of 11 U.S.C. § 1325(a):

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within

the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(*).

In the present case, the parties agree that the debt was incurred within 910 days of the bankruptcy petition and agree that the collateral for the debt was a motor vehicle acquired for the personal use of the debtors. Thus, the only contention under the hanging paragraph is whether GMAC has a purchase money security interest.

BAPCPA does not define what qualifies as a "purchase money security interest." Therefore, the Court looks to state law to determine whether GMAC's claim qualifies as a purchase money security interest. ***See In re Hayes***, 376 B.R. 655, 667-68 (Bankr. M.D. Tenn. 2007); ***In re Bray***, 365 B.R. 850, 854; ***In re Gray***, 382 B.R. 438, 440 (Bankr. E.D. Tenn. 2008).

Tennessee adopted Revised Article 9 of the Uniform Commercial Code, effective in 2001. Pursuant to Tennessee law, purchase money collateral are goods secured by a purchase money obligation. T.C.A. § 47-9-103(a)(1). A purchase money obligation is either: (1) an obligation incurred as all or part of the price of the collateral, or (2) an obligation for value given to enable the obligor to acquire rights in or the use of the

collateral, provided the value was used for that purpose. T.C.A. § 47-9-103(a)(2). A security interest in goods is a purchase money security interest to the extent that the goods are purchase money collateral with respect to the security interest. T.C.A. § 47-9-103(b)(1). *See In re Gray*, 382 B.R. 438, 440. Determining whether each dollar loaned "becomes a purchase money obligation by relationship in time or circumstances to the financing of purchase money collateral" requires a factual analysis of the close nexus or what enables a debtor to acquire rights in the property at issue. *In re Hayes*, 376 B.R. 655, 670.

### A. **NEGATIVE EQUITY**

"Negative equity is an unsecured debt owed by the buyer that must be paid to complete the debtor's purchase of the new car." *In re Gray*, 382 B.R. at 440. Pursuant to the definition of purchase money obligation found at T.C.A. § 47-9-103(a)(2), the financing of negative equity would be a non-purchase money debt. *See In re Hayes*, 376 B.R. at 672.

In the present case, the issue is whether any of the negative equity was part of the financed amount. In making this determination, the Court looks to the language of the agreement itself. The debtors traded in their old vehicle when they purchased the new truck. The trade-in was valued at $17,500.00 and secured a debt in the amount of $19,618.15, creating a negative equity of $2,118.15. The agreement clearly reflects that a $3000.00 rebate was paid against the negative equity of $2,118.15, creating a down payment of

$881.85. Basically, the debtors' transaction with GMAC had the same effect as if the debtors had taken the rebate money and paid cash to the creditor secured by the trade-in and then used the remainder as a down payment on the new vehicle. For convenience, part of the rebate money was passed through the new car dealer, but the effect was the same. Accordingly, the Court finds that the debtors' contract with GMAC applied the rebate to eliminate the negative equity so that no negative equity was financed. ***See In re Gray***, 382 B.R. at 442. ***See also In re Conyers***, 379 B.R. 576, 578 (Bankr. M.D.N.C. 2007).[1]

## B. GAP INSURANCE

Gap insurance protects debtors by covering the amount of damage that exceeds the value of the vehicle up to the outstanding balance of the secured loan. ***In re Munzberg***, 388 B.R. 529, 543 (Bankr. D. Vt. 2008) (citation omitted). Gap insurance "shifts a risk from

---

[1]The Court recognizes that Judge Lundin's analysis in ***In re Hayes*** would result in a different interpretation under the contract language. In a footnote, Judge Lundin explains how he determined the amount of "negative equity" financed:

> CitiFinancial asserts that the "negative equity" in this case was only $1,325.25. This amount is calculated by subtracting from $4,825.25 the $1,000 cash down payment by [the debtor] and the $2,500 rebate given on the purchase of the Malibu. CitiFinancial's calculation is not supported by the Contract. The cash and rebate are included under down payment on the new vehicle. The "pay off made by seller" is stated as $26,325.25 against an allowance on the trade-in of $21,500. The difference, the "negative equity," is $4,825.25.

376 B.R. 655, 659 n.2. Using Judge Lundin's calculations, the rebate in this case would not be applied to reduce the negative equity, and thus, the negative equity financed would be $2,118.15. This Court respectfully disagrees.

7 - U.S. Bankruptcy Court, M.D. Tenn.

the insured to an insurance company that is paid a premium to accept that risk." *In re Hayes*, 376 B.R. at 672.

In the present case, the agreement does not indicate that gap insurance enabled the debtors to purchase the new truck. In fact, the agreement states that "[y]our decision to buy or not buy other insurance will not be a factor in the credit approval process." Moreover, the gap insurance was issued by a separate company, First Colonial Insurance Company. While the shifting of risk from the debtors to the insurance company provided some incidental benefit to GMAC, the agreement itself contradicts a finding that this shift enabled the debtors to buy the vehicle. Accordingly, the Court agrees with the majority of cases that have concluded that financed insurance policies are not included in a purchase money security interest in a vehicle. *In re Hayes*, 376 B.R. at 671-72. *See also In re Munzberg*, 388 B.R. at 543-44; *In re Pajot*, 371 B.R. 139, 155 (Bankr. E.D. Va. 2007) (gap insurance is not part of purchase money security interest in vehicle); *In re Honcoop*, 377 B.R. 719, 723 (Bankr. M.D. Fla. 2007) (gap insurance does not involve "overall enhancement of the vehicle"); *In re White*, 352 B.R. 633, 639 (Bankr. E.D. La. 2006) (gap insurance is not part of purchase price because contract was separate asset, independent of vehicle purchase and its cost was paid to a third party, separate from seller).

Accordingly, the Court finds that the financed gap insurance is not a part of GMAC's purchase money security interest.

Because GMAC financed the purchase of gap insurance, not all of its claim is protected as a purchase money security interest. Again, the Court must look to Tennessee's version of the Uniform Commercial Code to determine how this bifurcation impacts the treatment of GMAC's claim pursuant to 11 U.S.C. § 1325(a)(*). Pursuant to T.C.A. § 47-9-103(e)(2)(A), "[i]n a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation . . . the payment must be applied so that the secured party retains no purchase money security interest in any property as to which the secured party has recovered payments aggregating the amount of the sale price including any finance charges attributable thereto." This statutory allocation rule has lead courts to find that Tennessee is a "dual status" state, meaning that the portion of the claim that represents the purchase money is treated as purchase money and the non-purchase money portion remains non-purchase money. *See In re Hayes*, 376 B.R. 655, 674-75, *In re Bray*, 365 B.R. 850, 860. *Contra In re Mitchell*, 379 B.R. 131, 142 (Bankr. M.D. Tenn. 2007) (Judge Paine) (claim that contains non-purchase money security interest debt is not qualified for exception set forth in 11 U.S.C. § 1325(a)(*)).

The dual status approach is consistent with the purpose of 11 U.S.C. § 1325(a)(*). As stated in *AmeriCredit Fin. Serv., Inc. v. Long (In re Long)*, 519 F.3d 288 (6th Cir. 2008), "[b]ased upon the legislative history, there is little doubt that the 'hanging-sentence architects intended only good things for car lenders and other lien-holders.'" *Id.* at 294 (citation omitted). Consequently, to adopt the debtors' all or nothing argument would circumvent the legislative intent to provide additional protection to car lenders. Under the dual status, the purchase money security interest portion of a car lender's claim receives the additional protection intended by 11 U.S.C. § 1325(a)(*).

In the present case, the agreement provides that GMAC "will apply each payment first to the earned and unpaid part of the Finance Charge, and then to the unpaid part of the Amount Financed." When read with T.C.A. § 47-9-103(e)(2), this provision allows for the allocation of payments to be made by the percentage of the amounts financed for each item of collateral, and allows for the determination of the purchase money claims that are eligible for protection from bifurcation under 11 U.S.C. § 1325(a)(*).

### III. CONCLUSION

The Court finds that GMAC's objection to confirmation is sustained in part and denied in part and that the debtors' plan should not be confirmed. GMAC holds a purchase money security interest within the scope of 11 U.S.C. § 1325(a)(*) to the extent of its claim less the amount charged for gap insurance. Pre-petition payments made by the debtors

toward GMAC's claim should be allocated pro rata in accordance with T.C.A. § 47-9-103(e)(2) and the terms of the agreement.[2]

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

---

[2] In reaching this decision, the Court did not consider the Truth in Lending Act, 15 U.S.C. §§ 1601-1667f, as argued by GMAC. The Court finds that the Truth in Lending Act "is a disclosure statute that does not presume to address the nature or extent of security interests under state or other federal law." *In re Hayes*, 376 B.R. 655, 673 n.25 (citation omitted).

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.